UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO. 3:07-CR-087 RLM |
| | ) | |
| SEFERINO AMAYA (1) | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**REPORT AND RECOMMENDATION**

**I.     Procedural Background**

On September 13, 2007, the Defendant, Seferino Amaya (Amaya) was indicted for one count of being a felon in possession of a shotgun, one count for being a felon in possession of shotgun ammunition, one count of being an illegal alien in possession of a shotgun, and one count of being an illegal alien in possession of shot gun shells.

On November 6, 2007, Amaya filed a Motion to Suppress and on November 9, 2007, the United States filed its response to his motion.  On November 8, 2007, this motion was referred to the undersigned to conduct any and all proceedings necessary to issue a report and recommendation concerning the appropriate disposition of Amaya's motion.  On November 26, 2007, an evidentiary hearing was held on Amayas's Motion to Suppress and following supplemental briefs, the Court heard oral argument on January 16, 2008.

Amaya argues that the search and seizure of a shotgun, its case and a box of a shotgun was constitutionally deficient.   More specifically, he argues that the arresting officers lacked probable cause to re-enter his residence and search the closet of an upstairs bedroom and that his

consent did not include looking into his closet.  For the following reasons, the undersigned **RECOMMENDS** that Amaya's Motion to Suppress be **DENIED**.

## II.      Facts

On May 30, 2007, the United States Marshal's Service in South Bend, Indiana learned that Amaya was wanted on a probation violation warrant from the Southern District of Texas. (Transcript of Hearing of 11/26/07 p. 9) (hereafter TR ).

Amaya had been convicted of smuggling aliens in 2003 and deported, but the Marshals Service was informed that Amaya had illegally re-entered the country and was residing at 202 Holcomb Street in LaPorte, Indiana. (TR 9) The Marshals Service also learned that Amaya had recently been charged with domestic violence after he assaulted his wife. (TR 9)

At approximately 6:15 A.M. on May 31, 2007, Deputy U.S. Marshal Amos Workman (Workman) and Corporals Daniel Wisniewski (Wisniewski) and Eric Dittrich (Dittrich), both of the St. Joseph County Sheriff's Department and the Great Lakes Regional Fugitive Task Force, arrived at Amaya's residence in Dittrich's vehicle. (TR 8, 10, 47, 63)  The agents initially conducted drive-by surveillance of the home. (TR 10)  They observed a woman standing by a vehicle in the driveway of the residence, and then they saw her walk to the back door of the house. (TR 11)

Workman walked to the front door of the residence while Dittrich and Wisniewski went to the back door, the same door they had observed the woman enter. (TR 13) Workman knocked on the front door and very loudly announced who he was four or five times without receiving a response. (TR 13-14)

2

Dittrich then entered a porch on the back of the house and knocked and announced on the back door. (TR 65)  He yelled that he was a police officer, but he received no response. (TR14-15, 66)  At this time, Wisniewski observed a woman in the kitchen walk toward the back door, turn around, turn off the lights in the kitchen, and walk out of the room without responding to Dittrich's commands to open the door. (TR 15, 48)

After the unsuccessful attempt to get a resident to answer the door, agents attempted to confirm that it was Amaya's residence. Wisniewski contacted the next door neighbor of Amaya who resided at 204 Holcomb Street. (TR 17)  Extension cords from the next door neighbor's home ran into Amaya's home, apparently providing electricity for Amaya's residence. (TR 48) Wisniewski showed her a picture of Amaya and,  the neighbor said Archer stated that Amaya did live at 202 Holcomb Street, that Amaya was at the house every day, and that "a bunch" of his family members lived in the house, including Amaya's two sons. (TR 40, 42-43, 48) Agents also retrieved insurance paperwork from the vehicle in Amaya's driveway, which listed the insured as Irma Zamora, Amaya's wife. (TR16, 49)

Because the residents of Amaya's home had refused to respond to the police, Workman called the LaPorte Police Department and asked for assistance.  And soon thereafter, additional officers arrived on the scene in a marked police vehicle. (TR 16)  Workman then approached the rear of the house, knocked and announced he was a police officer and a male voice eventually responded from the kitchen. (TR 19, 67)  Workman identified himself and directed the man to open the door. (TR 19)  Amaya, who spoke and understood English, then opened the door. (TR 19, 53)  Zamora and Enrique, her 10-year-old son, were also standing near the kitchen. (TR 20)

Workman removed Amaya from the home and handcuffed him, and agents conducted a protective sweep of the first floor of the residence. (TR19, 50)

3

Wisniewski walked Amaya to Dittrich's vehicle, which was parked in an alley adjacent to the back door of the house. (TR 19, 58)  Workman remained inside the house for approximately ten minutes speaking with Zamora and Enrique.  Because Zamora, could not speak English and was asking "what was going on" her son, Enrique, translated for his mother. (TR 19-20, 20-22, 45, 68)  Zamora asked why police were present and where were they taking Amaya. (TR 20) Workman explained that they had a warrant for Amaya based on a supervised release violation from Texas and that they were taking him into federal custody. (TR 20-21)

While Workman was in the kitchen, Wisniewski remained with Amaya in Dittrich's vehicle and asked Amaya no questions. (TR 50)  While standing next to the car, Amaya called out to Zamora and Enrique to retrieve his identification card, but Enrique responded that he did not know where the card was. (TR 51, 54-55, 58) Amaya then asked Wisniewski multiple times if agents could obtain his identification card, as Amaya had no identification documents on his person. (TR 51)  Amaya was "very adamant" that he wanted his identification card; he claimed that agents had arrested the wrong person and that if they obtained his identification card, it would demonstrate that he was not Seferino Amaya. (TR 51, 69)  Amaya did not identify where the card was in the house, and he stated that he did not know where in the house it was located. (TR 56, 69, 80)  During Amaya's requests, Dittrich came outside to the vehicle and also heard Amaya request his identification card multiple times. (TR 68-69)

Wisniewski remained with Amaya, while Dittrich returned to the house and informed Workman that Amaya wanted his identification card because he claimed that he was not Seferino Amaya. (TR 21-22, 51) Agents asked Zamora and Enrique where the identification card was, but they did not know. (TR 69, 77) Agents then asked Zamora if they

4

could search the home for the identification card, and she said they could. (TR 77)[1]  Agents could not locate the identification card in the kitchen, so Workman asked where Amaya's bedroom was, and Enrique stated that it was upstairs at the back of the hallway. (TR 22, 70, 78)

Workman and Dittrich went upstairs to retrieve Amaya's identification card and used flashlights because it was dark and there was no electricity upstairs. (TR 24, 26)  Workman went into the bedroom that Enrique had not identified as belonging to Amaya, while Dittrich went into Amaya's bedroom. (TR 25)   For officer safety, the agents looked anywhere in the bedrooms that a person could be located: in the closets, under the beds, and behind the doors before looking for the identification documents. (TR 25)

As he entered Amaya's bedroom, Dittrich observed a box of Winchester 12-gauge shotgun shells on the top of a dresser and a soft shotgun case in a corner by the window. (TR 27, 71-72)  At this point, Workman arrived in Amaya's bedroom. (TR 27)  Dittrich looked in the closet and observed a shotgun leaning against the wall. (TR 32-33, 73)  Workman observed an identification document next to the bed. (TR 33-34)  The identification card contained a photograph of Seferino Amaya, but misidentified him as Enrique Amaya. (TR 34)

At this point Workman left the home to retrieve a camera. (TR 34) On the way down, he asked Enrique if there were any other guns in the house. (TR 34)  Enrique stated that there were no more guns, that the shotgun belonged to his father, and that they used it to hunt at his grandfather's ranch. (TR 35)  Because agents knew that Amaya had a felony conviction, and also for their safety, Workman took the firearm and ammunition out of the house and secured the items in the police vehicle. (TR 35, 42)

---

[1]There was considerable argument whether Zamora understood the agent's request and gave a valid consent.  Because the Court concludes that that issue is not critical to its analysis or conclusion, it will not address the validity of her consent.

As the three agents rode to the Porter County jail with Amaya in the vehicle, the agents were discussing the shotgun. (TR 35)  Workman asked  Dittrich and Wisniewski what caliber the gun was. (TR 36) Before they could answer, Amaya volunteered "Twelve." (TR 36, 57, 74)

Enrique and Zamora testified to a somewhat different version of events.  But it is not necessary for the Court to resolve the differences as the Court's conclusions rest on the Defendant's statements and the agents' conduct alone.

**III.     Analysis**

While the United States offers the Court two legal justifications for the agents' conduct, only one is needed; consent.  Upon his arrest, Amaya protested that the agents had the wrong man.  Two witnesses testified, and Amaya does not dispute, that Amaya after his arrest asked his son, and then later the agents, to retrieve his identification documents from the house.  These documents, Amaya claimed, would show he was not the one called for in the warrant.  His son did not know where these documents were, so Amaya repeatedly asked the agents to go back into the house and retrieve the documents.  The agents obliged.  Not finding the documents on the first floor, the agents went upstairs and began looking in the bedrooms.  In Amaya's bedroom, the agent quickly found a box of shotgun shells on a dresser and then a soft shotgun case in the corner.  Soon thereafter, the agent looked into the closet and saw and recovered the shotgun.  Either after the gun was located or very near in time another agent, Workman, found the identification documents on a night stand next to the bed.

Because the Defendant asked the agents to go into the house to retrieve the identification documents, he can not seriously claim that the agents lacked authority to do what he asked – search for the requested documents.  The most he can argue is that the agents exceeded his consent by conducting an unreasonable search for his identification documents.

6

"Consensual searches are acceptable. . . because it is reasonable for law enforcement officers to conduct a search once they have been permitted to do so." United States v. Maldonado, 38 F.3d 936, 940 (7th Cir. 1994). However, before agents can conduct a consensual search, they must receive a valid and voluntary consent. Schneckloth v. Bustamonte, 412 U.S. 218, 222 (1973).  After a defendant gives consent for law enforcement agents to enter his house, the "scope of a consent search is limited by the breadth of actual consent." United States v. Torres, 32 F.3d 225, 230-231 (7th Cir. 1994).  Determining if the scope of the search exceeded the consent given "is a question of fact to be determined from the totality of all the circumstances." *Id*. at 231.

Clearly, the box of shotgun shells and then the shotgun case were seen "in plain view" and as such were legitimately and appropriately seized.  The shotgun in the closet is a little more complicated but not much.  Again, the breath of the consent, and therefore the lawfulness of the search, rests upon whether it was reasonable to look into the closet.  The agent testified he looked into the closet because he keeps documents in his own home in his closet.  While it would be unreasonable to search for the requested documents in some parts of the house, for example, pulling up carpeting or floor boards or searching in remote areas such as an attic or basement, where identification documents would unlikely be stored, this Court can not say that looking into a closet to see if it might contain shelves or other places to store identification documents is unreasonable.  To be sure, some areas are more likely than others to store the sought after documents, such as the night stand next to a bed, or the top of a dresser on the drawers of a dresser.  But while a closet may be less likely a place to store documents, it is not an unreasonable place to store such documents.  And reasonableness is what limits the scope of a consented search.  See United States  v. Saadeh, 61, F.3d 510, 518  (7th Cir. 1995).

Therefore, because it is clear that Amaya asked the agents to search for and to retrieve his identification documents, he gave them consent to search all areas within the house that might reasonably hold the identification documents. The closet was not an unreasonable area to search, and therefore, it was encompassed by his consent.

The United States also offers an additional theory to justify the search and seizure of the shotgun: that the agents were conducting a protective sweep for officer safety. However, because the Court has determined that Amaya gave consent to search the closet, it is unnecessary to discuss the alternative in detail. It is sufficient to note that prior to executing any search, with or without consent, officers may take reasonable steps to protect themselves. Securing a room to ensure that no others are present prior to conducting a search is a reasonable precaution for officers to take. cite Maryland v. Buie, 494 U.S. 325, 337 (1990).

## IV. Conclusion

Because Amaya asked agents to return to his residence to retrieve his identification documents, he consented to having the agents conduct a reasonable search. Looking inside a closet for identification documents is not unreasonable and therefore is encompassed by Amaya's consent. Additionally, it was not unreasonable to look inside the closet for officer's safety concerns. As a result, seeing and seizing the shotgun inside the closet as well as the box of shotgun shells and shotgun case were proper in all respects. Accordingly, the undersigned **RECOMMENDS** that Amaya's Motion to Suppress be **DENIED.**

> **NOTICE IS HEREBY GIVEN that within ten (10) days after being served with a copy of this recommended disposition a party may serve and file specific, written objections to the proposed findings and/or recommendations. Fed.R.Civ.P. 72(b). FAILURE TO FILE OBJECTIONS WITHIN THE SPECIFIED TIME WAIVES THE RIGHT TO APPEAL THE DISTRICT COURT'S ORDER.**

**SO ORDERED.**

Dated this January 23, 2008.

                                        S/Christopher A. Nuechterlein
                                       Christopher A. Nuechterlein
                                       United States Magistrate Judge